```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA,        ) AU:22-CR-00122-LY-5
                                      )
 4      Plaintiff,                    )
                                      )
 5   v.                               ) AUSTIN, TEXAS
                                      )
 6   KENNY CANO GUZMAN,               )
                                      )
 7      Defendant.                    ) FEBRUARY 16, 2023

 8         **********************************************
                  TRANSCRIPT OF DETENTION HEARING
 9              BEFORE THE HONORABLE MARK LANE
           **********************************************
10
     APPEARANCES:
11
     FOR THE PLAINTIFF:   MARK MARSHALL
12                        UNITED STATES ATTORNEY'S OFFICE
                          903 SAN JACINTO BOULEVARD, SUITE 334
13                        AUSTIN, TEXAS 78701

14   FOR THE DEFENDANT:   TERRENCE MICHAEL MARSH
                          LAW OFFICE OF TERRENCE MARSH
15                        601 QUAIL VALLEY DRIVE
                          GEORGETOWN, TEXAS 78626
16
     INTERPRETER:         LORENA DEVLYN
17
     TRANSCRIBER:         ARLINDA RODRIGUEZ, CSR
18                        501 WEST 5TH STREET, SUITE 4152
                          AUSTIN, TEXAS 78701
19                        (512) 391-8791

20

21

22

23

24   Proceedings recorded by electronic sound recording, transcript

25   produced by computer.
```

**EXAMINATION INDEX**

LANDON TODD DAVIS
        DIRECT BY MR. MARSHALL . . . . . . . . . . . . . . . 4
        CROSS BY MR. MARSH . . . . . . . . . . . . . . . . 13

DANIEL PALOMARES
        DIRECT BY MR. MARSH . . . . . . . . . . . . . . . . 20

NADIA GUILLANA RODRIGUEZ
        DIRECT BY MR. MARSH . . . . . . . . . . . . . . . . 22
        CROSS BY MR. MARSHALL . . . . . . . . . . . . . . . 24

ALEJANDRO CANO
        DIRECT BY MR. MARSH . . . . . . . . . . . . . . . . 28
        CROSS BY MR. MARSHALL . . . . . . . . . . . . . . . 29

```
08:15:43   1          (Proceedings began at 9:10 a.m.)
08:15:43   2          THE CLERK:  The Court calls the following for a
08:15:47   3   detention hearing: 1:22-CR-122, The United States of America v.
08:15:52   4   Defendant Number 5, Kenny Guzman.
08:15:55   5          MR. MARSHALL:  Mark Marshall for the United States.
08:16:07   6          MR. MARSH:  Attorney Terrence Marsh for Mr. Guzman.
08:16:13   7          THE COURT:  Good morning, gentlemen.  Good morning to
08:16:15   8   you, Mr. Guzman.  We are here on the government's motion to
08:16:17   9   detain.  I do note that we have a --
08:16:26  10          MR. MARSH:  Judge, if I may, I apologize.  She didn't
08:16:34  11   have her ear pods in for the interpreter.
08:16:37  12          THE COURT:  Okay.  Let's get that squared away.
08:16:41  13          Good?  Okay.
08:16:42  14          Well, let me just repeat myself.  We're here on the
08:16:45  15   government's motion to detain.  I do note an entry of a not
08:16:48  16   guilty plea as it relates to the arraignment responsibilities,
08:16:52  17   and we'll get that filed.
08:16:53  18          Mr. Marshall, where is the government with that
08:16:56  19   motion?
08:16:56  20          MR. MARSHALL:  We'll continue with the motion,
08:16:57  21   Your Honor.
08:16:58  22          THE COURT:  All right, sir.  I'll let you call your
08:17:07  23   first witness or introduce any evidence that you may have.
08:17:15  24          MR. MARSHALL:  I will.  Pursuant to 3142, we would
08:17:18  25   invoke the presumption of both a risk of flight and a danger to
```

08:17:32   1   the community in this case.  I think we'd be focusing on risk

08:17:38   2   of flight in this particular instance.

08:17:40   3           I'll call Todd Davis.

08:17:42   4           THE COURT:  Is that an agent or --

08:17:45   5           MR. MARSHALL:  Agent.

08:17:45   6           THE COURT:  Agent Davis, if you'd come on up to our

08:17:50   7   witness stand, we'll get started.

08:17:51   8           As he's doing that, Mr. Marshall, let me tell you

08:18:11   9   what you know, which is the government's obligated to provide

08:18:14   10  any information subject to *Brady v. Maryland* and its progeny to

08:18:19   11  the defense as soon as reasonably possible, and the failure to

08:18:25   12  do that in a timely manner subjects the government to a number

08:18:28   13  of sanctions up to and including dismissal of the case.

08:18:31   14          MR. MARSH:  Yes, sir.

08:18:32   15          THE COURT:  All right, sir.  We'll get that done.

08:18:34   16          And, Agent Davis, if you'd raise your right hand,

08:18:39   17  you'll be sworn.

08:18:40   18      (Witness sworn)

08:18:46   19          THE COURT:  Have a seat, sir.

08:18:50   20          And, Mr. Marshall, he's your witness.

08:18:54   21                          **LANDON TODD DAVIS,**

08:18:54   22  having been first duly sworn, testified as follows:

08:18:54   23                          **DIRECT EXAMINATION**

08:18:54   24  **BY MR. MARSHALL:**

08:18:56   25  Q.   Once you're situated, tell us your name and spell your

08:18:58    1    name for the record?

08:18:59    2    A.    Sure.    My name is Landon Todd Davis, L-a-n-d-o-n T-o-d-d

08:19:09    3    D-a-v-i-s.

08:19:12    4    Q.    How are you employed?

08:19:13    5    A.    I'm a special agent with the Drug Enforcement

08:19:19    6    Administration.

08:19:21    7    Q.    How long have you been with DEA?

08:19:23    8    A.    Eighteen and a half years.

08:19:25    9    Q.    In your capacity as an agent with DEA, did you and other

08:19:36    10   agents have an occasion to investigate allegations that Yunier

08:19:44    11   Basulto-Alvarez and others were engaged in the distribution of

08:19:52    12   controlled substances?

08:19:53    13   A.    Yes, sir, we did.

08:19:54    14   Q.    How did that investigation begin?

08:19:57    15   A.    So it was information passed from the Texas Department of

08:19:59    16   Public Safety.    The DPS Narcotics Squad had been looking at

08:20:07    17   Mr. Basulto-Alvarez.    The Drug Enforcement Administration

08:20:13    18   opened a case on him in approximately January 2021, with the

08:20:19    19   information that Mr. Basulto-Alvarez was distributing kilogram

08:20:28    20   quantities of methamphetamine and cocaine.

08:20:30    21   Q.    Did you do some preliminary investigation to corroborate

08:20:33    22   the information given by DPS?

08:20:35    23   A.    Yes, sir.    That's correct.    We did a few controlled buys

08:20:42    24   using a confidential informant from Mr. Basulto-Alvarez, as

08:20:47    25   well as surveillance as well as phone tele-analysis.

DAVIS - DIRECT                                          6

08:20:53  1  Q.   In doing your surveillance and doing your controlled buys,
08:20:57  2  did anyone notice Ms. Kenny Cano Guzman?
08:21:03  3  A.   She was noticed on multiple occasions as being a
08:21:06  4  girlfriend of Mr. Basulto-Alvarez.  Off the top of my head, I
08:21:12  5  cannot remember if she was around for any of the purchases we
08:21:18  6  did using the confidential informant.
08:21:22  7  Q.   That's the preliminary stuff?
08:21:24  8  A.   Yes, sir.  Correct.
08:21:25  9  Q.   Were they living in the same location as far as you could
08:21:28  10  tell from surveillance?
08:21:29  11  A.   Yes, sir.
08:21:29  12  Q.   In that respect, after you did your controlled buys, what
08:21:38  13  action did you take?
08:21:40  14  A.   We started proceeding towards a Title III intercept of
08:21:44  15  Mr. Basulto-Alvarez's phone.
08:21:45  16  Q.   Did you successfully get a court order for Title III
08:21:50  17  intercepts on that phone?
08:21:51  18  A.   Yes, sir, we did.  The first one we attempted to go up on
08:21:56  19  was in June of 2021.  About the time that we turned on the
08:22:02  20  phone, Mr. Basulto-Alvarez had already switched to another
08:22:06  21  phone.  So then we wrote for the next phone and got up on that
08:22:09  22  on July 14th of 2021.
08:22:13  23  Q.   What did you notice when you were doing the interceptions
08:22:16  24  on that phone?
08:22:16  25  A.   At this point in time, Mr. Basulto-Alvarez's conversations

08:22:20  1  confirmed what we thought, that he was a multi-kilogram

08:22:24  2  distributor of methamphetamine and cocaine.

08:22:26  3  Q.   Did he specifically talk about the distribution of meth

08:22:29  4  and coke?

08:22:29  5  A.   Yes, sir.

08:22:30  6  Q.   In kilo quantities?

08:22:32  7  A.   Correct.  Yes, sir.

08:22:33  8  Q.   And that was specifically on which phone?

08:22:36  9  A.   Target telephone 2 is what we called it.

08:22:44 10  Q.   And going through those particular phone calls, did you

08:22:46 11  take enforcement action to corroborate the fact that these were

08:22:51 12  actually controlled substance distributions?

08:22:55 13  A.   In the course of target telephone 2, we were trying to be

08:23:01 14  especially careful, because our ultimate purpose was to figure

08:23:07 15  out who his source of supplies were.  Based on the fact that he

08:23:11 16  had already dumped one target telephone before we even got up

08:23:14 17  and we knew he changed telephones frequently, we were pretty

08:23:18 18  careful as far not to knock anything off that would rattle him

08:23:22 19  enough to where he would throw the phone in the trash, is what

08:23:26 20  we call it, with target telephone 2.

08:23:30 21        So, in that instance, I'm trying to remember if we

08:23:34 22  did a traffic stop or anything.  We did do surveillance as far

08:23:39 23  as hearing conversations to go out and watch the meetings.  We

08:23:45 24  would identify the people that were meeting with

08:23:49 25  Basulto-Alvarez or his couriers that he designated.  But I

08:23:54  1  can't remember if we traffic stopped anybody in the course of

08:23:58  2  target telephone number 2.

08:24:00  3  Q.    And that's fine.  But the surveillance and other

08:24:08  4  activities corroborated the fact that these were drug

08:24:12  5  transactions?

08:24:12  6  A.    Yes, sir.  Absolutely.  Correct.  He was -- he would set

08:24:14  7  up a meeting location.  The other person would show up.

08:24:17  8  Mr. Basulto-Alvarez would identify what vehicle he was in or

08:24:35  9  his courier was in.  The other individual would identify what

08:24:45  10  vehicle he was in.  We would observe those two individuals

08:24:47  11  meet, hand to hand, and then after that they would depart.  If

08:24:51  12  it was a courier, the courier would then call back to

08:24:58  13  Mr. Basulto-Alvarez to confirm that the meeting had taken place

08:25:05  14  and every thing was done.

08:25:06  15  Q.    In the course of the interceptions on target telephone

08:25:09  16  number 2, were there occasions when you intercepted

08:25:13  17  conversations with Kenny Cano Guzman on that target telephone?

08:25:18  18  A.    Yes, sir.  Multiple instances where we intercepted

08:25:21  19  Ms. Guzman on target telephone 2.

08:25:24  20  Q.    And, specifically, what kind of conversations was she

08:25:26  21  having during the pertinent phone calls?

08:25:28  22  A.    During the pertinent phone calls, it would -- I mean, for

08:25:32  23  instance, there would be one where Mr. Basulto-Alvarez would

08:25:35  24  call and say that the guy is coming by to pick up one.

08:25:41  25  Ms. Guzman would ask where it -- where that would be.

08:25:44   1   Mr. Basulto-Alvarez would say it's sitting on top of the

08:25:47   2   dresser.  Then, the conversation -- the next conversation would

08:25:52   3   be that the individual came by and the deal was completed.

08:25:56   4   Q.   Were there several of those phone calls?

08:25:58   5   A.   Yes, sir.

08:25:59   6   Q.   Approximately how many?

08:26:00   7   A.   Over the three intercepts we had on Mr. Basulto-Alvarez, I

08:26:06   8   would say there were 10 to 15 where it was -- it sounded like

08:26:09   9   an explicit transaction and instructions.

08:26:12   10  Q.   Again, you went up on two other target telephones --

08:26:16   11  A.   Yes, sir.

08:26:26   12  Q.   -- with regard to Basulto-Alvarez; is that correct?

08:26:29   13  A.   That's right.

08:26:30   14  Q.   Same activity on those phones?

08:26:36   15  A.   Yes, sir.

08:26:42   16  Q.   Finally, directing your attention to about May of 2022,

08:26:53   17  did you take some specific enforcement action with regard to a

08:26:57   18  large quantity of methamphetamine allegedly possessed by

08:27:01   19  Basulto-Alvarez?

08:27:02   20  A.   That's correct.  On May 12th of 2022, agents intercepted

08:27:11   21  Mr. Basulto-Alvarez at his apartment.  Mr. Basulto-Alvarez

08:27:15   22  granted consent to search his apartment.  Inside the apartment

08:27:19   23  and inside the vehicles, it was a cumulative total of, I think,

08:27:28   24  40 kilograms of methamphetamine that were seized that day,

08:27:32   25  multiple guns inside the apartment, and then nearly a kilogram

DAVIS - DIRECT                                                    10

08:27:36  1    of cocaine inside the apartment as well, too.

08:27:38  2    Q.    Who was in the apartment when the search occurred?

08:27:41  3    A.    Mrs. Guzman.

08:27:42  4    Q.    All right.  You indicated there was cocaine in the

08:27:46  5    apartment.  Where was that cocaine located?

08:27:48  6    A.    I believe it was in the bedroom, sir.

08:27:50  7    Q.    All right.  Were there other drugs located in the

08:27:53  8    apartment as well?

08:27:54  9    A.    There was.  There was methamphetamine already bagged up in

08:28:00  10   ounce quantity bags sitting out in plain view in the apartment,

08:28:06  11   ready for him to distribute to -- to customers.

08:28:09  12   Q.    And, again, this is the same apartment she was sharing

08:28:11  13   with -- the defendant was sharing with Mr. Basulto-Alvarez?

08:28:15  14   A.    All the time.  And she was present there at the time of --

08:28:18  15   of this ordeal on May 12th.

08:28:21  16   Q.    At this point were you ready to take this entire case

08:28:24  17   down?

08:28:24  18   A.    No, sir.  Definitely not.

08:28:26  19   Q.    Had you identified, for instance, Mr. Rojelio Orozco yet

08:28:33  20   as the supplier?

08:28:34  21   A.    Yes, sir, we had.

08:28:35  22   Q.    Were you still working on that particular case?

08:28:39  23   A.    We were.  Yes, sir.

08:28:40  24   Q.    Did that carry through August of 2021 or '2, rather?

08:28:46  25   A.    So we were up on Mr. Orozco's phone at that point in time,

08:28:55  1  still trying to identify who his source of supplies were, any

08:29:06  2  other kilogram customers.  So, yes, that pushed into -- into at

08:29:13  3  least June, that time frame.  And at that point in time, we

08:29:17  4  were still trying to identify some of the people we had

08:29:23  5  intercepted on Mr. Basulto-Alvarez's phone, as well as

08:29:27  6  Mr. Orozco's phone, as well as some of the other

08:29:38  7  coconspirators.

08:29:39  8  Q.    Now, on May of 2022, Yunier Basulto-Alvarez was arrested

08:29:47  9  was he not?

08:29:48  10  A.    Yes, sir.  That's correct.

08:29:49  11  Q.    And charged in federal court.  Was Ms. Guzman arrested at

08:29:55  12  that point?

08:30:01  13  A.    She was not.

08:30:02  14  Q.    Was that part of maintaining the -- the confidentiality of

08:30:10  15  sources and the ongoing investigation?

08:33:27  16  A.    That's correct.  Yes, sir.

08:33:29  17  Q.    In that respect, did you keep tabs on Ms. Guzman after May

08:34:11  18  of 2022?

08:34:11  19  A.    Yes, we did.

08:34:12  20  Q.    Did she stay in that same apartment where the

08:34:16  21  methamphetamine and cocaine were discovered?

08:34:18  22  A.    For a very short period, and then she moved to the

08:34:21  23  apartment complex, at least we believe, where she was finally

08:34:25  24  arrested a couple of weeks ago.

08:34:28  25  Q.    All right.  Who did she move in with at that apartment?

DAVIS - DIRECT                                              12

08:34:31  1  A.   At that point in time, it is our understanding she moved

08:34:34  2  in with one of Mr. Basulto-Alvarez's lead couriers, Yoandry

08:34:48  3  Morales-Ortiz.

08:34:49  4  Q.   All right.  Was he still a target of the investigation?

08:34:53  5  A.   Yes, he was.

08:34:53  6  Q.   Was he still active in the investigation at that point?

08:35:00  7  A.   At that point in time, yes, we believe he was still

08:35:04  8  distributing some of the narcotics that we missed from

08:35:08  9  Mr. Basulto-Alvarez.

08:36:15  10  Q.   Did he subsequently flee the jurisdiction, and we're still

08:36:23  11  trying to find him?

08:36:29  12  A.   That's correct.  Yes, sir.

08:36:31  13            MR. MARSHALL:  I pass the witness.

08:36:32  14            MR. MARSH:  Do you want me to stand at the podium,

08:36:40  15  Judge?

08:36:40  16            THE COURT:  Wherever you're comfortable.  Yeah.  It's

08:36:43  17  usually best.

08:36:44  18            MR. MARSH:  Sure.  Okay.

08:36:46  19            THE COURT:  While you're coming up, you mentioned

08:36:47  20  that there was other -- other phones were wire-tapped; is that

08:36:51  21  right?

08:36:52  22            THE WITNESS:  Correct.

08:36:53  23            THE COURT:  Was the defendant on any of those

08:36:58  24  conversations?

08:36:58  25            THE WITNESS:  No, sir.  We were going up at that

08:37:01  1  point in time, and so these were people that were not in

08:37:03  2  regular contact with Ms. Guzman.

08:37:05  3          THE COURT:  All right.  So this only Basulto?

08:37:11  4          THE WITNESS:  Correct.  Yes, sir.

08:37:11  5          THE COURT:  And the roommate of the defendant, I

08:37:13  6  don't see that person's name on the indictment.

08:37:16  7          THE WITNESS:  That's correct.

08:37:18  8          THE COURT:  Okay.  All right.

08:37:19  9          MR. MARSHALL:  She's a fugitive; is that correct?

08:37:29  10          THE WITNESS:  So, again, when we presented everything

08:37:32  11  to the U.S. Attorney's Office, I was asking for quite a few

08:37:34  12  more defendants than ended up being --

08:37:37  13          THE COURT:  That's usually the case.

08:37:39  14          THE WITNESS:  Yes, sir.

08:37:42  15          MR. MARSH:  May I proceed, Your Honor?

08:37:43  16          THE COURT:  Yes.  Absolutely.

08:37:45  17                    **CROSS-EXAMINATION**

08:37:45  18  **BY MR. MARSH:**

08:37:45  19  Q.  Agent Davis, let's go back and talk about that series of

08:37:53  20  phone calls where you said that Mr. Basulto-Alvarez directed my

08:38:01  21  client to "some guy's coming to pick up one."

08:38:05  22  A.  Sure.  Yes, sir.

08:38:06  23  Q.  Remember that?

08:38:07  24  A.  Yes, sir.

08:38:07  25  Q.  Okay.  About what time frame was that phone call made?

08:38:12  1  A.    That would be I think actually two days after we went up

08:38:16  2  on the intercept as far as the one you're referring to,

08:38:18  3  July 16th, 2021.

08:38:20  4  Q.    Okay.  And between July 16th, 2021 and

08:38:27  5  Mr. Basulto-Alvarez's arrest, I think you testified there were

08:38:30  6  about 10 or 15 phone calls?

08:38:32  7  A.    Yes, sir.

08:38:33  8  Q.    Between Mr. Basulto-Alvarez and my client; is that right?

08:38:41  9  A.    There were 10 to 15 that were clear like that.  As far as

08:38:47  10  pertinent phone calls, we had about 50 that we intercepted with

08:38:56  11  Ms. Guzman between Mr. Basulto-Alvarez and her that were tied

08:39:02  12  in with the time frame of narcotics transactions.  Again, as

08:39:06  13  far there were only about 10 to 15 that were explicit to where

08:39:10  14  she was standing in as the intermediary for him when he was not

08:39:17  15  at the apartment for a narcotics transaction.

08:39:19  16  Q.    And as far as those transactions go that you're talking

08:39:23  17  about here, when he's telling her to go pick up one or other --

08:39:30  18  other code language, was any investigation done or any arrest

08:39:37  19  made to confirm that that transaction was in fact a drug deal?

08:39:43  20  A.    No, sir.  As far as what you're asking is, did we end up

08:39:47  21  stopping anybody from leaving the apartment after they met with

08:39:50  22  Ms. Guzman, no, we did not do that.

08:39:55  23  Q.    Okay.  And so, again, we are talking about 50 or some

08:39:57  24  calls between July 16th, '21 through May 12th of '22, right?

08:40:04  25  A.    Yes, sir.

DAVIS - CROSS

08:40:04  1   Q.   And these were involving Ms. Guzman?

08:40:06  2   A.   That's correct.  So, Mr. Marsh, if I can intercede on that

08:41:03  3   one, so that's about 50 what we classify as pertinent phone

08:41:06  4   calls.  As far as phone calls between the two of them, in

08:41:10  5   general, I -- I don't have the numbers in front of me because

08:41:13  6   we just don't pay attention to those that much.  I'm sure there

08:41:16  7   were probably hundreds as far as we intercepted.  But, for the

08:41:20  8   purpose of a drug investigation, we don't classify those as

08:41:24  9   pertinent.  Non-pertinent is what they're designated, and so we

08:41:27  10  kind of just let those filter off.

08:41:32  11  Q.   Okay.  But the 10 to 15 that sounded like drug

08:41:40  12  transactions --

08:41:41  13  A.   Yes, sir.

08:41:41  14  Q.   -- during that time period --

08:41:42  15  A.   Sure.

08:41:43  16  Q.   -- those are attributed to Ms. Guzman?

08:41:46  17  A.   That's correct.  Yes, sir.

08:41:47  18  Q.   You arrested Mr. Basulto-Alvarez May 12th of '22, right?

08:41:53  19  A.   That's correct.  Yes, sir.

08:41:54  20  Q.   Had there been any subsequent phone calls between the two

08:41:57  21  of them?

08:42:01  22  A.   Subsequent?

08:42:02  23  Q.   Subsequent phone calls between Mr. Basulto-Alvarez and

08:42:05  24  Ms. Guzman, directing her to do, in your training and

08:42:10  25  experience, illegal activity.

08:42:12    1  A.   Are you talking about from when he was in jail or anything

08:42:15    2  else?

08:42:15    3  Q.   Correct.

08:42:17    4  A.   Okay.  So asking the Court's forgiveness, we were so busy

08:42:22    5  focused on the other source of supplies that we didn't dwell

08:42:29    6  too much into Mr. Basulto-Alvarez's phone calls to Ms. Guzman

08:42:33    7  at that point in time.  We felt like we had the information we

08:42:36    8  needed on her.

08:42:37    9        We do know that, at the time of the search warrant on

08:42:40   10  May 12th, there were, I think, five vehicles in that parking

08:42:44   11  lot that were attributed to Mr. Basulto-Alvarez.  We know that

08:42:47   12  Ms. Guzman had command and control of those after he went to

08:42:52   13  jail.  But that's about as far as the level of activity that we

08:42:56   14  knew about from her.  We were gathering information from

08:42:58   15  confidential sources on her, but weren't really pursuing an

08:43:02   16  active investigation into her after that.

08:43:06   17  Q.   Okay.  So between July 16th, 2021 and this May 12th, '22

08:43:11   18  date, had you already developed enough incriminating evidence

08:43:15   19  against my client --

08:43:16   20  A.   That's correct.

08:43:16   21  Q.   -- to arrest her had you wanted to?

08:43:18   22  A.   Yes, sir.

08:43:19   23  Q.   So her boyfriend/husband gets arrested, Mr. Alvarez, and

08:43:30   24  you allow her to stay out in the world doing whatever she's

08:43:35   25  going to do?

08:43:35  1   A.   Yes, sir.

08:43:36  2   Q.   Between that May 12th, 2022 date and the day of her

08:43:42  3   arrest, had you developed any additional incriminating evidence

08:43:49  4   against my client?

08:43:50  5   A.   No.

08:43:51  6   Q.   Okay.  So just so we're clear, you could have arrested her

08:44:01  7   at that point.  You just decided not to?

08:44:03  8   A.   So at that point in time, again, the list of people that I

08:44:07  9   wanted to go ahead and arrest was long.  I was -- I don't know

08:44:13  10  how to say this.  If -- if I make too big of a wave as far as

08:44:17  11  what I do, then that encourages other coconspirators to flee

08:44:22  12  the area.  And that's what I was trying not to do at that point

08:44:26  13  in time.  I wanted it to look like it was a very limited action

08:44:30  14  against Mr. Basulto-Alvarez rather than a complex investigation

08:44:33  15  at that point in time.

08:44:34  16  Q.   Okay.  But Ms. -- Ms. Guzman had been present in the

08:44:37  17  apartment when you executed the search warrant and arrested

08:44:40  18  Mr. Basulto-Alvarez?

08:44:42  19  A.   That's correct, yes.

08:44:42  20  Q.   So would it be fair to say that, had she wanted to flee or

08:44:47  21  she could have fled, she would have?

08:44:49  22  A.   That's probably pretty fair.  Yes, sir.

08:44:52  23  Q.   Had you had any communication with Ms. Guzman between the

08:44:57  24  May 12th arrest and her arrest?

08:44:59  25  A.   There may have been communication with her immediately

08:45:04  1  following the May 12th situation in which two of the vehicles

08:45:07  2  were turned back over to Mr. Basulto-Alvarez's representative.

08:45:11  3  I can't remember if that was directly speaking with her or with

08:45:14  4  another family member of Mr. Basulto-Alvarez.

08:45:16  5  Q.   And related to those vehicles, did you conduct any

08:45:20  6  investigation as far as her dealings with them, how they were

08:45:24  7  moved, or whether she actually transported them anywhere?

08:45:28  8  A.   As far as?  I'm sorry, Mr. Marsh.  So specifically ask ...

08:45:35  9  Q.   So just, again, those five vehicles you testified to --

08:45:38  10  A.   Sure.  Yes, sir.

08:45:39  11  Q.   -- right?

08:45:40  12         Did Ms. Guzman move them?  Did she transport them?

08:45:45  13  Did she even touch them during that period?

08:45:47  14  A.   So the answer is yes to one of those.  One of them was

08:45:51  15  a -- a truck that Mr. Basulto-Alvarez had at the apartment

08:45:56  16  complex and actually used for a few narcotics transactions.

08:46:01  17  That truck is located at the apartment complex where

08:46:06  18  Mrs. Guzman was arrested just a few weeks ago.

08:46:10  19  Q.   All right.  As far as you know, Ms. Guzman had a -- a

08:46:15  20  vehicle at the time, right?

08:46:19  21  A.   Yes.

08:46:20  22  Q.   Did you do any investigation in to her specific vehicle

08:46:26  23  and find any narcotics?

08:46:27  24  A.   No.  No narcotics.  The only investigation into it was who

08:46:32  25  the registered owner was, that type of basic information.

DAVIS - CROSS                                                                    19

08:46:39  1  Q.   When you arrested Ms. Guzman, do you know who she was

08:46:43  2  living with, specifically?

08:46:44  3  A.   Her cousin.

08:46:45  4  Q.   Okay.  Did you do any investigation into her cousin to

08:46:48  5  figure out whether or not he had any criminal history or

08:46:51  6  involvement?

08:46:51  7  A.   There was nothing we could find on any involvement or

08:46:54  8  anything that was a red flag for us.

08:46:56  9  Q.   You testified to Mr. Morales-Ortiz.  Who is that again?

08:47:02  10  A.   That was one of the couriers that operated for

08:47:05  11  Mr. Basulto-Alvarez.

08:47:07  12  Q.   And approximately how long was she living with him?

08:47:11  13  A.   Only a few months, as far as we were aware.

08:47:16  14  Q.   Had Ms. Guzman's phone been tapped from the May 12th

08:47:27  15  arrest forward?

08:47:33  16  A.   No, sir.

08:47:35  17             MR. MARSH:  I'll pass the witness, Judge.

08:47:39  18             MR. MARSHALL:  No further questions.

08:47:40  19             THE COURT:  Agent Davis, you can step down.

08:47:49  20             THE WITNESS:  Thank you.

08:47:50  21             THE COURT:  Mr. Marshall, do you have any additional

08:47:51  22  evidence?

08:47:52  23             MR. MARSHALL:  No additional evidence.

08:47:54  24             THE COURT:  All right.  Mr. Marsh, do you have any

08:47:57  25  evidence you'd like to present?

| | | |
|---|---|---|
| 08:47:59 | 1 | MR. MARSH:  Judge, I'd like to call Mr. Palomares. |
| 08:48:05 | 2 | THE COURT:  All right.  Mr. Palomares.  Oh, the |
| 08:48:11 | 3 | pretrial services officer? |
| 08:48:13 | 4 | MR. MARSH:  Yes, sir. |
| 08:48:13 | 5 | THE COURT:  Okay.  Sure.  Officer Palomares, if you |
| 08:48:38 | 6 | would raise your right hand and be sworn. |
| 08:48:41 | 7 | (Witness sworn) |
| 08:57:00 | 8 | MR. MARSH:  May I proceed, Judge? |
| 08:57:05 | 9 | THE COURT:  Yes, sir. |
| 08:57:06 | 10 | **DANIEL PALOMARES,** |
| 08:57:06 | 11 | having been first duly sworn, testified as follows: |
| 08:57:06 | 12 | **DIRECT EXAMINATION** |
| 08:57:06 | 13 | **BY MR. MARSH:** |
| 08:57:06 | 14 | Q.   Mr. Palomares, obviously, you've been working on this case |
| 08:57:17 | 15 | and you've spoken to Ms. Guzman, right? |
| 08:57:20 | 16 | A.   That's correct. |
| 08:57:20 | 17 | Q.   And you've also spoken to Mr. Cano, her cousin, who she |
| 08:57:28 | 18 | lives with, correct? |
| 08:57:28 | 19 | A.   Yes. |
| 08:57:29 | 20 | Q.   And he was able to corroborate the information that you |
| 08:57:34 | 21 | put in your reports? |
| 08:57:36 | 22 | A.   That's correct. |
| 08:57:37 | 23 | Q.   And after hearing the -- the testimony from Agent Davis |
| 08:57:40 | 24 | today, it looked like, between your conversation with Mr. Cano |
| 08:57:45 | 25 | yesterday and producing your report, you revised it and made |

PALOMARES - DIRECT

08:57:55    1    new recommendations to the Court as far as conditions for my

08:58:00    2    client if she was to be released?

08:58:09    3    A.    Yes.  That's correct.

08:58:11    4    Q.    And after hearing Agent Davis's testimony, in light of

08:58:17    5    those recommendations, do you still continue with those same

08:58:20    6    recommendations?

08:58:21    7    A.    Yes.

08:58:21    8              MR. MARSH:  No further questions, Judge.

08:58:23    9              MR. MARSHALL:  Nothing further.

08:58:24    10             THE COURT:  All right.  Thank you Officer Palomares.

08:58:26    11   You can step down, sir.

08:58:27    12             Any additional witnesses or evidence, Mr. Marsh?

08:58:30    13             MR. MARSH:  Yes, Judge.  I have two witnesses.  One

08:58:32    14   is going to be Nadia Guillana.  She's present in the courtroom.

08:58:39    15             THE COURT:  Ma'am, if you'd come forward, please.

08:58:46    16             Make your way to our witness stand, please.  Before

08:59:00    17   sitting down, if you'll raise your right hand and be sworn.

08:59:27    18        (Witness sworn)

08:59:27    19             THE COURT:  Have a seat.  Please give us your full

08:59:28    20   name and spell your last name.

08:59:30    21             THE WITNESS:  Nadia Guillana Rodriguez,

08:59:44    22   G-u-i-l-l-a-n-a.

08:59:48    23             THE COURT:  Go ahead.

08:59:49    24             ************************

            25

08:59:49  1                    **NADIA GUILLANA RODRIGUEZ**

08:59:49  2   having been first duly sworn, testified through the

08:59:49  3   interpreter, Lorena Devlyn, as follows:

08:59:49  4                    **DIRECT EXAMINATION**

08:59:49  5   **BY MR. MARSH:**

08:59:49  6   Q.   Ms. Guillana, how old are you?

08:59:53  7   A.   Fifty-two.

08:59:58  8   Q.   What's your highest level of education?

09:00:01  9   A.   I completed 12th grade with an associate's degree in

09:00:11  10  economics.

09:00:12  11  Q.   Do you have any criminal history?

09:00:14  12  A.   No.

09:00:17  13  Q.   Where are you from?

09:00:19  14  A.   From Cuba.

09:00:24  15  Q.   How are you employed?

09:00:26  16  A.   I work at a Hispanic clinic.

09:00:33  17  Q.   Okay.  How long have you worked there?

09:00:35  18  A.   A year and a half.

09:00:39  19  Q.   Jumping right into it, how do you know Ms. Guzman?

09:00:44  20  A.   I met her in February of 2016, when we started a journey

09:00:57  21  from Ecuador all the way to here.

09:01:00  22  Q.   And so is it fair to say, then, you've known her or you've

09:01:05  23  both been here the same amount of time?

09:01:08  24  A.   Correct.

09:01:09  25  Q.   How would you describe Kenny's character?

GUILLANA RODRIGUEZ - DIRECT

09:01:14  1  A.   I've known her since -- since then, like I said, and she's

09:01:29  2  very honest and hardworking woman.

09:01:32  3  Q.   Have you ever seen Kenny do anything illegal?

09:01:36  4  A.   No.  Never.

09:01:37  5  Q.   Have you ever seen her use drugs?

09:01:41  6  A.   No.  Never.

09:01:43  7  Q.   Have you ever seen her drunk?

09:01:45  8  A.   No.  Never.

09:01:48  9  Q.   If the judge asked you to sign an unsecured bond in this

09:01:56  10  case as a condition of Ms. Guzman's release, would you be

09:02:01  11  willing to do that?

09:02:11  12  A.   Yes.

09:02:11  13  Q.   Okay.  Also, now, since you've known Kenny, how often

09:02:16  14  would you speak with her or visit with her?

09:02:18  15  A.   Weekly.  We speak weekly.

09:02:26  16  Q.   Is it -- is it fair to say, then, that you're pretty close

09:02:32  17  with her?

09:02:33  18  A.   Yes.  She comes to visit with me at my house because my

09:02:45  19  mother is sick, so she comes often to check on my mom.

09:02:52  20  Q.   Would you also be willing to be a third-party custodian of

09:02:55  21  Ms. Guzman and let the Court know if Ms. Guzman is not

09:02:58  22  following her conditions if she's released?

09:03:01  23  A.   Yes.

09:03:10  24  Q.   Now, you don't have any involvement in anything of what

09:03:15  25  we're talking about this morning as far as criminal activity,

| | | |
|---|---|---|
| 09:03:24 | 1 | correct? |
| 09:03:24 | 2 | A.   No.  Not at all. |
| 09:03:29 | 3 | Q.   And you don't have any direct knowledge of what the agent |
| 09:03:36 | 4 | testified to this morning? |
| 09:03:37 | 5 | A.   No. |
| 09:03:38 | 6 | Q.   Do you know when the last time was that Kenny went to |
| 09:03:45 | 7 | Cuba? |
| 09:03:52 | 8 | A.   I think about three years ago. |
| 09:03:55 | 9 | Q.   What are the conditions like in Cuba? |
| 09:03:57 | 10 | A.   Terrible. |
| 09:04:04 | 11 | Q.   Would you want to return to Cuba? |
| 09:04:09 | 12 | A.   No.  Not at all. |
| 09:04:17 | 13 | MR. MARSH:  I'll pass the witness, Judge. |
| 09:04:23 | 14 | **CROSS-EXAMINATION** |
| 09:04:23 | 15 | **BY MR. MARSHALL:** |
| 09:04:23 | 16 | Q.   Good morning, ma'am.  Did you understand what the agent |
| 09:04:25 | 17 | said when he testified? |
| 09:04:27 | 18 | A.   Yes. |
| 09:04:32 | 19 | MR. MARSH:  Judge, may I, briefly?  Ms. Guzman's |
| 09:04:35 | 20 | headset is dead. |
| 09:04:38 | 21 | THE COURT:  Okay.  Thank you for letting us know. |
| 09:05:06 | 22 | Q.   (BY MR. MARSHALL) I'm going to ask the same question, |
| 09:05:08 | 23 | ma'am.  Did you understand what the agent said when he |
| 09:05:10 | 24 | testified? |
| 09:05:11 | 25 | A.   Yes. |

GUILLANA RODRIGUEZ - CROSS                                    25

| 09:05:17 | 1  | Q.   So you understood he testified that he overheard |
| 09:05:19 | 2  | conversations where Ms. Guzman helped distribute ounce |
| 09:05:26 | 3  | quantities of methamphetamine on several occasions? |
| 09:05:46 | 4  | A.   Yes.  I heard that. |
| 09:05:48 | 5  | Q.   Was that a surprise? |
| 09:05:49 | 6  | A.   Of course. |
| 09:05:52 | 7  | Q.   Had you ever been over to her apartment on Gracy Farms? |
| 09:05:56 | 8  | A.   Yes. |
| 09:05:59 | 9  | Q.   How many times? |
| 09:06:01 | 10 | A.   A few. |
| 09:06:04 | 11 | Q.   Just a few? |
| 09:06:05 | 12 | A.   Correct. |
| 09:06:11 | 13 | Q.   Would you be surprised if they had methamphetamine laying |
| 09:06:15 | 14 | out in plain view when the officers went into that apartment? |
| 09:06:18 | 15 | A.   I'm very surprised. |
| 09:06:26 | 16 | Q.   Did you ever see any firearms at that apartment? |
| 09:06:29 | 17 | A.   Never. |
| 09:06:31 | 18 | Q.   Again, you'd be surprised if they found a bunch of |
| 09:06:34 | 19 | firearms in the apartment, wouldn't you? |
| 09:06:37 | 20 | A.   Of course. |
| 09:06:39 | 21 | Q.   Did you know Mr. Basulto-Alvarez as well? |
| 09:06:46 | 22 | A.   Yes. |
| 09:06:46 | 23 | Q.   Did you think he was a pretty good guy, too? |
| 09:06:56 | 24 | A.   Yes. |
| 09:06:56 | 25 | Q.   So you're surprised when they found over 40 kilos of |

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

09:07:02  1  methamphetamine in his vehicle outside the same apartment?

09:07:07  2  A.   Of course.

09:07:12  3  Q.   So, if that's all true, that's a big part of their lives

09:07:17  4  that Ms. Guzman and Mr. Basulto-Alvarez are hiding from you,

09:07:22  5  isn't it?

09:07:31  6  A.   I didn't know about that.

09:07:34  7  Q.   I believe you.  The question was:  If it's true, they were

09:07:39  8  hiding that from you, weren't they?

09:07:41  9  A.   Of course.

09:07:50  10          MR. MARSHALL:  Pass the witness.

09:07:51  11          MR. MARSH:  Nothing further from this witness, Judge.

09:07:56  12          THE COURT:  Ms. Guillana, you said that you respected

09:08:01  13  Ms. Guzman because she's a hard worker.  What do you base that

09:08:08  14  opinion on?

09:08:11  15          THE WITNESS:  Well, since I've known her, I know her

09:08:43  16  to be somebody that works, and, that I know of, she doesn't

09:08:48  17  have any bad habits.

09:08:50  18          THE COURT:  Where does she work?

09:08:54  19          THE WITNESS:  At the Amazon warehouses.

09:09:10  20          THE COURT:  Where did she work before then?

09:09:18  21          THE WITNESS:  They had a nightclub.

09:09:24  22          THE COURT:  Who had a nightclub?

09:09:29  23          THE WITNESS:  Her and Junior.

09:09:31  24          THE COURT:  Who is Junior?

09:09:34  25          THE WITNESS:  Her boyfriend.

| | | |
|---|---|---|
| 09:09:36 | 1 | THE COURT:  Oh.  Basulto-Alvarez? |
| 09:09:39 | 2 | THE WITNESS:  Yes. |
| 09:09:42 | 3 | THE COURT:  And what was the name of the club that |
| 09:09:47 | 4 | they owed? |
| 09:09:49 | 5 | THE WITNESS:  Copa.  The Copa. |
| 09:09:51 | 6 | THE COURT:  How do you spell that?  The Copa? |
| 09:09:56 | 7 | THE WITNESS:  C-o-p-a. |
| 09:10:01 | 8 | THE COURT:  And where is that in town? |
| 09:10:09 | 9 | THE WITNESS:  It was on Burnet, but I don't know |
| 09:10:12 | 10 | exactly where. |
| 09:10:14 | 11 | THE COURT:  And what kind of club is it? |
| 09:10:15 | 12 | THE WITNESS:  It was like an after-party. |
| 09:10:24 | 13 | THE COURT:  After-party?  What does that mean? |
| 09:10:26 | 14 | THE WITNESS:  Where people go dance, like a disco. |
| 09:10:36 | 15 | THE COURT:  But like after hours, after 2:00 a.m. in |
| 09:10:38 | 16 | the morning?  I mean, what were the operating hours of The |
| 09:10:43 | 17 | Copa. |
| 09:10:43 | 18 | THE WITNESS:  From midnight to 5:00 a.m., if I'm |
| 09:10:55 | 19 | correct. |
| 09:11:02 | 20 | THE COURT:  Did you know Ms. Guzman to work at Rick's |
| 09:11:04 | 21 | Cabaret for the last four and a half years? |
| 09:11:10 | 22 | THE INTERPRETER:  Your Honor, can you repeat the name |
| 09:11:12 | 23 | of the cabaret? |
| 09:11:14 | 24 | THE COURT:  Rick's. |
| 09:11:19 | 25 | THE WITNESS:  In what? |

| | | |
|---|---|---|
| 09:11:22 | 1 | THE COURT:  Did you know that she worked at Rick's |
| 09:11:25 | 2 | Cabaret for four and a half years, from 2018 until August or |
| 09:11:31 | 3 | sometime in the summer of 2022? |
| 09:11:48 | 4 | THE WITNESS:  Yes. |
| 09:11:49 | 5 | THE COURT:  Why didn't you tell me that earlier? |
| 09:11:51 | 6 | THE WITNESS:  Because I wasn't asked that. |
| 09:11:59 | 7 | THE COURT:  I asked you where you knew she worked. |
| 09:12:01 | 8 | All right.  I have no more questions.  Ma'am, you can |
| 09:12:03 | 9 | step down. |
| 09:12:10 | 10 | MR. MARSH:  May I proceed, Judge? |
| 09:12:17 | 11 | I'll call Alejandro Cano. |
| 09:12:57 | 12 | THE INTERPRETER:  Your Honor, can I give the witness |
| 09:12:57 | 13 | another set of headsets? |
| 09:12:57 | 14 | THE COURT:  Absolutely.  All right, sir.  If you'll |
| 09:12:58 | 15 | raise your right hand, you'll be sworn. |
| 09:13:00 | 16 | (Witness sworn) |
| 09:13:13 | 17 | THE COURT:  Have a seat. |
| 09:13:15 | 18 | **ALEJANDRO CANO,** |
| 09:13:15 | 19 | having been first duly sworn, testified through the |
| 09:13:15 | 20 | interpreter, Lorena Devlyn, as follows: |
| 09:13:15 | 21 | **DIRECT EXAMINATION** |
| 09:13:15 | 22 | **BY MR. MARSH:** |
| 09:13:15 | 23 | Q.  Would you please state your name for the record. |
| 09:13:24 | 24 | A.  Alejandro Cano. |
| 09:13:29 | 25 | Q.  And you're Kenny's cousin, correct? |

CANO - CROSS                                                              29

| | | |
|---|---|---|
| 09:13:31 | 1 | A.    Yes. |
| 09:13:31 | 2 | Q.    You were living with her the day she was arrested, right? |
| 09:13:34 | 3 | A.    Yes. |
| 09:13:36 | 4 | Q.    You don't have any criminal history here or in Cuba, |
| 09:13:45 | 5 | correct? |
| 09:13:45 | 6 | A.    No. |
| 09:13:45 | 7 | Q.    How long have you lived with Kenny? |
| 09:13:48 | 8 | A.    About six months. |
| 09:13:50 | 9 | Q.    And, if Kenny was released, do you believe she would live |
| 09:13:55 | 10 | with you following release? |
| 09:13:56 | 11 | A.    Yes. |
| 09:14:00 | 12 | Q.    And you've recently received or in the process of |
| 09:14:05 | 13 | receiving some type of refugee status from Cuba, correct? |
| 09:14:10 | 14 | A.    Yes. |
| 09:14:15 | 15 | Q.    And what are the conditions like in Cuba? |
| 09:14:22 | 16 | A.    Terrible. |
| 09:14:23 | 17 | Q.    And you probably won't want to return to Cuba, would you? |
| 09:14:28 | 18 | A.    No. |
| 09:14:29 | 19 |          MR. MARSH:   No further questions, Judge. |
| 09:14:33 | 20 |                    **CROSS-EXAMINATION** |
| 09:14:33 | 21 | **BY MR. MARSHALL:** |
| 09:14:33 | 22 | Q.    When did you get to the United States? |
| 09:14:36 | 23 | A.    May 5th of -- May 5th, 2022. |
| 09:14:50 | 24 | Q.    So you just got here recently? |
| 09:14:52 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 09:14:53 | 1 | Q.   Did you know Mr. Basulto-Alvarez? |
| 09:14:58 | 2 | A.   A little bit, but I do know him. |
| 09:15:02 | 3 | Q.   Were you over at that apartment on Gracy Farms? |
| 09:15:08 | 4 | A.   Yes. |
| 09:15:08 | 5 | Q.   How many times? |
| 09:15:10 | 6 | A.   Once in June.  I came to visit her for a week. |
| 09:15:21 | 7 | Q.   How about before May 12th, when that place was searched? |
| 09:15:24 | 8 | A.   No.  I lived in Houston. |
| 09:15:33 | 9 | Q.   Before today, did you know that particular residence had |
| 09:15:36 | 10 | been searched? |
| 09:15:37 | 11 | A.   Yes. |
| 09:15:41 | 12 | Q.   Did you know they had over 40 kilos of meth in and around |
| 09:15:45 | 13 | that residence? |
| 09:15:46 | 14 | A.   No.  No. |
| 09:15:50 | 15 | Q.   Did you know there were ounce quantities of meth wrapped |
| 09:15:53 | 16 | up for distribution sitting in plain view in that residence? |
| 09:15:57 | 17 | A.   No. |
| 09:16:02 | 18 | Q.   Do you know anything about the firearms in that residence? |
| 09:16:04 | 19 | A.   No. |
| 09:16:07 | 20 | Q.   Did Kenny ever tell you anything about that search? |
| 09:16:12 | 21 | A.   No. |
| 09:16:14 | 22 | Q.   Did she ever tell you anything about the dope and |
| 09:16:19 | 23 | Basulto-Alvarez distributing dope? |
| 09:16:21 | 24 | A.   No. |
| 09:16:28 | 25 | Q.   A whole lot of stuff she didn't tell you, isn't there? |

09:16:30  1   A.    Right.

09:16:33  2               MR. MARSHALL:  Pass the witness.

09:16:34  3               MR. MARSH:  Nothing further, Judge.

09:16:36  4               THE COURT:  All right, sir.  You can step down.

09:16:38  5               Anything else, Mr. Marsh?

09:16:39  6               MR. MARSH:  Nothing further, Judge.

09:16:40  7               MR. MARSHALL:  Nothing further.

09:16:41  8               THE COURT:  All right.  We'll proceed to argument in

09:16:43  9   a moment.

09:17:04  10              Mr. Marshall?

09:17:08  11              MR. MARSHALL:  The biggest question I think the Court

09:17:11  12  has is:  Why didn't we arrest her in May, and what happened

09:17:14  13  between May and now?  We didn't arrest her in May because we

09:17:17  14  didn't want to blow the investigation and let all the suppliers

09:17:21  15  and other individuals get away.  We took the case down as

09:17:26  16  quickly as we could, and, quite frankly, we were successful in

09:17:30  17  that regard.

09:17:31  18              I would posit that Ms. Guzman thought she was free

09:17:36  19  and clear in this particular instance because nothing happened

09:17:41  20  to her.  That doesn't eviscerate the fact that now she knows,

09:17:47  21  now she's in trouble, now she's facing a big charge, and now

09:17:52  22  she knows that she got caught on the phone helping her

09:17:54  23  boyfriend/husband, Mr. Basulto-Alvarez, distribute quantities

09:17:58  24  of methamphetamine, lots of which were found in her apartment,

09:18:03  25  in plain view, along with firearms and other materials.

09:18:10  1          It's a strong case against her, one element the Court

09:18:15  2   has to weigh.  The second element is, is she going to go

09:18:18  3   anywhere?  I suggest that the only reason she's hung around is

09:18:26  4   because she thought she got away with it.

09:18:28  5          I would suggest that now she understands the severity

09:18:32  6   of this offense, she understands that she could be going to

09:18:37  7   prison for a long time, and Cuba may well be a better place

09:18:42  8   than prison.  We don't know.  She's got significant ties to

09:18:52  9   Cuba.  Her family lives in Cuba.  She's traveled to Cuba in the

09:19:01  10  past.  In this particular instance, I don't think there's a set

09:19:06  11  of conditions you can set that will rebut the presumption in

09:19:09  12  this case.

09:19:11  13         THE COURT:  Mr. Marsh?

09:19:12  14         MR. MARSH:  Yes, Judge.  Judge, I think the

09:19:20  15  discussion over disrupting the investigation, if Mr. Alvarez

09:19:25  16  was the big dog and she's living with him, she's the first

09:19:30  17  ripple when the stone hits the pond next to him.  She could

09:19:34  18  have alerted all these other people.  I haven't heard any

09:19:40  19  evidence that she did or has.  They let her stay out for a

09:19:44  20  period of time.  There's no additional evidence between the

09:19:47  21  date of his arrest that she was engaged in any further criminal

09:19:50  22  activity.

09:19:51  23         She -- you heard testimony that Cuba is a terrible

09:19:54  24  place.  Someone who has lived here for years doesn't want to go

09:19:58  25  back.  Someone who has recently arrived doesn't want to go

09:20:04  1   back.  She does have a -- she does have her residency.  She has

09:20:10  2   been working legally.  And I would ask that the Court adopt the

09:20:15  3   recommendations from pretrial services, order the unsecured

09:20:25  4   bond, put the restrictions on her that pretrial services has

09:20:30  5   requested, and release her.  Thank you.

09:20:35  6          THE COURT:  What's this Copa business?

09:20:38  7          MR. MARSH:  Judge, my understanding with that Copa

09:20:41  8   business was that it was owned and operated by her boyfriend.

09:20:45  9          THE COURT:  But why wasn't it disclosed?

09:20:48  10         MR. MARSH:  I -- I don't know, Judge.

09:20:51  11         THE COURT:  Okay.  Mr. Marshall?

09:20:56  12         MR. MARSHALL:  I can answer that question by proffer.

09:20:59  13  Initially, on the first wires, Basulto-Alvarez was running that

09:21:05  14  particular place.  He operated out of that place.  We caught

09:21:10  15  the calls coming from that location going back and forth, and

09:21:14  16  then he dropped that phone.  That place subsequently went out

09:21:17  17  of business.  But that's the initial part of the case, and she

09:21:22  18  worked there for a time.  She was in an out of that place.

09:21:27  19         The only other thing I would mention in rebuttal is

09:21:30  20  that Mr. Basulto-Alvarez wasn't the big guy.  Orozco was.  And

09:21:36  21  that's who we stopped and waited and made sure we could get.

09:21:41  22         THE COURT:  Yeah.  To be clear, tactically, if you

09:21:43  23  were moving forward on the danger prong, I might have some

09:21:47  24  issues with waiting --

09:21:48  25         MR. MARSHALL:  Yes, sir.

09:21:48    1        THE COURT:  -- to arrest.  But, as I understand it,

09:21:51    2    you're moving forward on the flight prong.

09:21:52    3        MR. MARSHALL:  Correct.

09:21:52    4        THE COURT:  And waiting until now, that makes a

09:21:54    5    tremendous amount of sense.

09:21:59    6        MR. MARSHALL:  All right, sir.

09:22:00    7        THE COURT:  Okay.  Mr. Marsh, I'm more concerned with

09:22:05    8    the fact that, you know, this whole one of the leaders of a

09:22:11    9    drug dealing enterprise has got girlfriends and wives and

09:22:19   10    there's levels of their involvement.  And sometimes the

09:22:25   11    government is a little too aggressive in going after some of

09:22:31   12    those women, but this is a little different.

09:22:35   13        The evidence I heard is that she's immersed in this

09:22:43   14    business.  And with all due respect -- and there's nothing

09:22:46   15    wrong with working at a strip club -- but my experience in life

09:22:54   16    has been strip clubs are just dens of dope and bad behavior.

09:23:00   17    And, you know, your witness doesn't even offer that up.

09:23:08   18        I mean, what do I do with a woman who is maybe not as

09:23:13   19    higher up the food chain as her boyfriend, but she's just as

09:23:17   20    involved in the drug enterprise, and the strength of the

09:23:20   21    evidence -- again, I respect your abilities; you know that --

09:23:24   22    but the strength of the evidence against her is overwhelming:

09:23:29   23    wiretaps; she's present at an apartment with guns and drugs in

09:23:39   24    plain view; she's a visitor to our country for what, '16, seven

09:23:43   25    years and, within two or three, she's involved in drugs.

09:23:47  1            I mean, Ms. Guzman, I'm going to order that you be
09:23:54  2    detained.  I find that the government has met its burden to
09:24:00  3    establish that you're a risk of not coming to court when you're
09:24:04  4    supposed to.  I have way too many questions about your
09:24:08  5    background or your involvement in this.  And I'm not really
09:24:13  6    sure the presumption has been rebutted, but even if it has been
09:24:16  7    rebutted, the fact remains you were integrally involved in a
09:24:25  8    major narcotics conspiracy and you're facing an enormous amount
09:24:33  9    of time in federal prison, unless things change, all of which
09:24:39 10    are reasons to flee.
09:24:40 11            And the whole fleeing to Cuba thing, that's not --
09:24:43 12    it's just hiding in plain sight.  That's what -- I don't want
09:24:47 13    to create a situation in which she's motivated to leave, go
09:24:52 14    anywhere in the United States, and have the Marshals Service
09:24:55 15    have to go out and look for her.  That's flight, and that's
09:25:00 16    flight that concerns me.  If she promised to go to Cuba for the
09:25:04 17    rest of her life, I might change my mind.  But that's not
09:25:12 18    what's going to happen.
09:25:15 19            So I'll enter an order detaining Ms. Guzman until
09:25:20 20    this case is concluded.  We're adjourned.
09:25:27 21        (Proceedings concluded at 9:53 a.m.)
         22
         23
         24
         25

**REPORTER'S CERTIFICATE**

1

2    I, Arlinda Rodriguez, do hereby certify that the foregoing

3 was transcribed from an electronic recording made at the time

4 of the aforesaid proceedings and is a correct transcript, to

5 the best of my ability, made from the proceedings in the

6 above-entitled matter, and that the transcript fees and format

7 comply with those prescribed by the Court and Judicial

8 Conference of the United States.

9

10 /S/ Arlinda Rodriguez                    March 10, 2023

11 ARLINDA RODRIGUEZ                         DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25